CLERK'S OFFICE
A TRUE COPY
Jul 19, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>Information associated with Apple IDs coachreese65@icloud.com (Target Account 1) and bigreese3135@gmail.com (Target Account 2) that is stored at premises controlled by Apple Inc. | Case No. 24-M-449 (SCD)<br><br>Matter No. 2023R00283 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ______________ District of ______________ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 8-2-24 *(not to exceed 14 days)*

❐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Stephen C. Dries.
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❐ for ____ days *(not to exceed 30)* ❐ until, the facts justifying, the later specific date of ______________.

Date and time issued: 7-19-24. 9:25 am — Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, Wisconsin — Stephen C. Dries, United States Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with **coachreese65@icloud.com**, **Target Account 1,** and **bigreese3135@gmail.com**, **Target Account 2**, which are stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, California.

## ATTACHMENT B

**Particular Things to be Seized**

**I. Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b. All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses,

Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c. The contents of all instant messages associated with the account from January 1, 2020 to present, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

d. The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

e. All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call

invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

f. All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

g. All records pertaining to the types of service used;

h. All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

i. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. §841(a)(1) (distribution of controlled substances), 21 U.S.C. §846 (conspiracy to distribute controlled substances), and 21 U.S.C. §843(b) (use of a communicate facility in furtherance of drug trafficking); involving Stephen REESE since January 1, 2020, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a. Acquisition and distribution of controlled substances and collection and movement of drug proceeds;

b. Conspiracy to possess and distribute controlled substances;

c. Laundering of monetary assets;

d. Communications between Stephen REESE and others known and yet unknown related to narcotics trafficking and movement of drug proceeds;

e. Location of stash houses, rental agreements in connection with drug trafficking, payments for controlled substances, and other information related to the distribution of narcotics and controlled substances;

f. Information about the location or whereabouts of Stephen REESE;

g. The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

h. Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

i. Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

j. Evidence indicating the subscriber's state of mind as it relates to the crime under investigation; and

k. Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

CLERK'S OFFICE
A TRUE COPY
Jul 19, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with Apple IDs coachreese65@icloud.com (Target Account 1) and bigreese3135@gmail.com (Target Account 2) that is stored at premises controlled by Apple Inc.

Case No. 24-M-449 (SCD)

Matter No. 2023R00283

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the ______________ District of ______________, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC. §§ 841(a)(1), 846, & 843(b) | Possession with intent to distribute & conspiracy to distribute controlled substances; unlawful use of communication facilities |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

KOSTANDEAN KAZAMIAS
Digitally signed by KOSTANDEAN KAZAMIAS
Date: 2024.07.18 14:16:52 -05'00'

*Applicant's signature*

DEA SA Kostandean P. Kazamias

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 7-19-24

Stephen C. Dries

*Judge's signature*

City and state: Milwaukee, Wisconsin

Stephen C. Dries, United States Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Kostandean P. Kazamias, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Apple Inc. ("Apple"), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed since 2020. I am currently assigned to the Milwaukee District Office, Group 63. My duties include the investigation of drug trafficking organizations and violations of federal narcotics and money laundering laws, including, but not limited to offenses defined by 21 U.S.C. §§ 841, 843, and 846, and

18 U.S.C. §§ 1956 and 1957. I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, and Section 2516.

3. I have participated and assisted in complex narcotics investigations, which involved violations of state and federal controlled substances laws and money laundering laws, and other related offenses. I have had both formal training and have participated and assisted in complex drug trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

a. I have used informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b. I have also relied upon informants to obtain controlled substances from dealers;

c. I have experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

d. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and

methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

e. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

f. I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations; additionally, I know that due to the proliferation of social media as well as end to end, user encrypted, communication/messaging applications (e.g.: WhatsApp, Facebook Messenger, Apple FaceTime, SnapChat, Instagram, etc.) drug traffickers utilize these communication methods, in addition to traditional communication methods (text messaging, wireless phone calls, etc.) because they offer a communication method that cannot be monitored through traditional law enforcement investigative means, thus enabling concealment of discussions and communication with narcotics customers and suppliers surrounding their drug trafficking network;

g. I know that the use of online travel booking and reservations systems requires a user to supply an email address to send the user a confirmation of their travel reservation;

h. I know that an "email" address is an online service that can be utilized through a mobile device, computer or other means, to retrieve and send electronic mail messages. Examples of websites that provide this service include: Google

(Gmail) www.google.com, Yahoo (yahoo mail) www.yahoo.com, and Hotmail www.hotmail.com;

i. I have been assigned to court-authorized wiretaps and have been trained to operate the equipment utilized to conduct such operations; and

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Throughout this affidavit, reference will be made to case agents or officers. Case agents or officers are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

6. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1), 843(b), and 846 have been committed by Stephen REESE and others. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

**JURISDICTION**

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### Summary

8. The Drug Enforcement Administration (DEA) and the North Central High Intensity Drug Trafficking Area (HIDTA) are currently investigating the drug trafficking activities of a multi-state Drug Trafficking Organization (DTO). During the course of the investigation case agents have identified multiple individuals involved in supplying multi-kilogram quantities of narcotics to Milwaukee, Wisconsin, and other areas. Evidence gathered during the course of this investigation reflects that Cornel C. CARNEGIE and Marcel D. OXLEY SR. are responsible for, and coordinating the movement of, multi-kilogram quantities of narcotics from California. The evidence further reflects that Aurion M. OXLEY, Tamara D. MONTGOMERY, Marcel D. OXLEY JR., Vincent L. NICHOLSON JR., and others work with OXLEY SR. and CARNEGIE to facilitate the movement of narcotics to, and store narcotics at, various stash locations in Milwaukee, Wisconsin. Case agents have discovered that at least some of the narcotics are transported via commercial airlines from California to Chicago, Illinois, and then to Milwaukee, Wisconsin. The narcotics are then supplied to multiple individuals in the Milwaukee area, to include Anthony T. WILKS, who distributes the narcotics from the restaurant and bar he operates known as Jack's Executive Bistro, located at 4923 W. Villard Avenue, Milwaukee, Wisconsin.

9. During the course of this investigation, phone records and surveillance footage led agents to believe that Stephen REESE, an employee at the LAX airport, was assisting the DTO by bringing suspected controlled substances into LAX's sterile area

beyond the security checkpoint and thereafter providing the controlled substances to other DTO members, including Michelle CARTER, Kristen CENDEJAS, Marcel OXLEY JR, Tamera MONTGOMERY, and others, who fly them to Chicago, IL.

10. Surveillance footage and phone records reflect that REESE met with DTO members at LAX and was believed to have exchanged "SwissGear" style backpacks with them on multiple occasions.

**Background of Investigation and REESE's Phone Records**

11. From June 2023 through present, case agents conducted several interviews with SOI #1. SOI #1 told case agents that various members in the DTO are smuggling kilogram quantities of various types of controlled substances, including fentanyl, crystal methamphetamine, heroin, and cocaine, on commercial airlines from California to Chicago O'Hare International Airport (ORD) by paying TSA agents to get the narcotics through airport security. More specifically, according to SOI #1, DTO members give the narcotics to TSA agents outside of the airport, typically in a black Swiss Gear backpack, and the TSA agents then bring the narcotics in the black Swiss Gear backpack through security. The TSA agents then give the backpack containing the narcotics to a different member in the DTO who is scheduled to take the flight and who has already gotten through airport security. Once the narcotics arrive in Chicago, SOI #1 stated that a courier transports the narcotics to Milwaukee, Wisconsin, typically in an Uber. According to SOI #1, the DTO facilitates weekly narcotics trips from California to ORD, and the DTO keeps TSA agents on "payroll" for the DTO.

12. SOI #1 further stated that, in much the same fashion, the DTO uses commercial airlines from ORD to California to facilitate the movement of drug proceeds in the form of bulk cash U.S. currency. SOI #1 stated that in 2022, on various occasions, SOI #1 went to ORD with a black Swiss Gear backpack containing drug proceeds. SOI #1 stated that SOI #1 has gone to ORD with Tamera MONTGOMERY, Marcel OXLEY SR., Marcel OXLEY JR. (OXLEY SR.'s son), Aurion OXLEY (OXLEY SR.'s daughter), and Vincent NICHOLSON JR. (NICHOLSON). SOI #1 stated that when SOI #1 arrived at ORD, a TSA employee met SOI #1 and SOI #1's associates at the vehicle they arrived in and took the black Swiss Gear backpack containing the drug proceeds. The TSA employee took the backpack containing drug proceeds through security and gave it to another DTO member who subsequently transported it to California. Additionally, SOI #1 stated that the TSA employee would receive a few thousand U.S. dollars as payment for transferring the backpack containing the drug proceeds to the airline passenger involved with the DTO.

13. Law enforcement records reflect that bulk U.S. currency was seized from various DTO members at an airport in 2018. More specifically, on May 18, 2018, at the Cincinnati/Northern Kentucky International Airport in the B Concourse, case agents from DEA Cincinnati RO and the Cincinnati/Northern Kentucky Airport Police Department reviewed flight manifests and discovered suspicious flight itineraries for OXLEY SR., Aurion OXLEY, and Rosie ANDERSON. Case agents engaged in a consensual encounter with these three individuals and stated they were looking for weapons, narcotics, or large sums of money travelling though the airport. Case agents

asked OXLEY SR., Aurion OXLEY, and ANDERSON if officers could search their luggage, and all three individuals consented to the search. During the search of OXLEY SR., Aurion OXLEY, and ANDERSON, case agents located U.S. currency in a large white envelope on each of them. Case agents seized approximately $27,469 U.S. dollars in total from OXLEY SR. ($7,715), Aurion OXLEY ($8,814), and ANDERSON ($10,940).

14. Beginning in June of 2023, SOI #1 made statements against SOI #1's penal interest. The information provided by SOI #1 is consistent with evidence gathered during the course of this investigation where SOI #1 was not used, and much of SOI #1's information has been corroborated through independent investigation, including law enforcement records, toll records, and surveillance. SOI #1's criminal history includes convictions for felon in possession of a firearm, bail jumping felony, possess with intent to distribute THC, and possess with intent to distribute THC. SOI #1 is cooperating in exchange for consideration related to SOI #1's involvement in narcotics trafficking (charges not currently pending). Finally, SOI #1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein, unless otherwise noted. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe SOI #1 is credible and SOI #1's information reliable.

15. Case agents conducted telephone toll analysis and discovered that (323) 812-2879, a phone used by Stephen REESE, has been in contact with members of the Oxley DTO, both known and unknown, since at least June 22, 2022. Case agents believe it is likely REESE was in contact with DTO members prior to this time, however case agents only have telephone tolls dating back to June 14, 2022. Based on REESE's employment records, he was hired as a maintenance employee at LAX in 2016.

**Stephen REESE Smuggled Narcotics in April and May 2024**

16. REESE met with a DTO associate during the early morning hours of April 11, 2024. Through United Airlines flight records, case agents learned that a previously identified courier of the DTO, Kristen CENDEJAS, had flown from LAX to Chicago, IL on April 11, 2024. Case agents reviewed LAX surveillance footage from April 11, 2024. Surveillance footage depicted REESE meeting with CENDEJAS at approximately 4:14 a.m. PST, and the two appeared to exchange black colored "SwissGear" style backpacks in Terminal 6, near the area of elevator T6-9.

17. Before this exchange, REESE, at (323) 812-2879, received calls from (669) 322-6506 on April 10, 2024 at approximately 11:11 p.m. PST, and April 11, 2024 at approximately 3:28 a.m. and approximately 4:13 a.m. PST, moments before REESE and CENDEJAS met with each other. Initially, case agents believed (669) 322-6506 was another phone being used by CENDEJAS. However, on a later date while physically surveilling CENDEJAS, case agents called (669) 322-6506 and a male voice answered. Therefore, case agents believe the user of (669) 322-6506, FNU LNU, contacted REESE to coordinate the exchange of backpacks with CENDEJAS.

18. Later on April 11, 2024, surveillance footage from ORD reflected CARTER being dropped off by a vehicle at Terminal 2, at which point CARTER entered Chicago O'Hare Airport and subsequently walked inside an airport bathroom at approximately 12:39 p.m., at the same time CENDEJAS was in this same bathroom. CARTER entered the bathroom with what appeared to be an empty backpack and exited carrying a backpack that appeared to contain items. Case agents believe that CARTER and CENDEJAS switched backpacks while inside the bathroom. CARTER then re-entered the vehicle she came in and traveled back to Milwaukee.

19. Based on their familiarity with this investigation, case agents believe REESE carried a backpack containing narcotics through airport security at which point he provided it to CENDEJAS. CENDEJAS then flew the narcotics from LAX to ORD where, upon arrival, CENDEJAS provided the narcotics to CARTER who transported them to Milwaukee.

20. Case agents reviewed LAX surveillance footage from May 12, 2024, which depicted REESE meeting with a second previously identified member of the DTO, Marcel OXLEY JR., and appeared to exchange black colored "SwissGear" style backpacks in Terminal 6, near the area elevator T6-9.

21. Additionally, case agents reviewed LAX surveillance footage from May 13, 2024, which depicted REESE again meeting with CENDEJAS in the same area of Terminal 6, near the area of elevator T6-9. REESE and CENDEJAS appeared to exchange black colored "SwissGear" style backpacks during this encounter.

22. Based on their training, experience, and familiarity with this investigation,

case agents believe that on both dates, REESE met with the DTO associates to bring narcotics past security and conduct narcotics transactions.

**Seizure of 10 Kilograms of Cocaine**

23. On May 10, 2024, the Honorable Stephen C. Dries, United States Magistrate Judge, Eastern District of Wisconsin, signed a warrant authorizing the collection of data pertaining to the location of multiple cellular telephones, to include REESE's cell phone ((323) 812-2879) and CARTER's cell phone ((414) 888-9090).

24. Based on electronic and physical surveillance, case agents were aware OXLEY SR. was at ORD and travelled to Milwaukee, WI on June 2, 2024.

25. During the morning hours of June 4, 2024, court-authorized location data for OXLEY SR.'s phone and CARTER's phone revealed both traveled from Milwaukee to the area of ORD, seemingly together. At approximately 6:32 a.m., OXLEY SR.'s phone and at 6:38 a.m., CARTER's phone were in the immediate vicinity of ORD. As time passed, OXLEY SR.'s phone traveled northbound to Milwaukee while CARTER's phone remained at ORD. Therefore, case agents believed OXLEY SR. drove CARTER to ORD so she could take a flight while he returned to Milwaukee.

26. Flight records and location data for CARTER's phone revealed CARTER, after a brief layover at the Salt Lake City International Airport, flew into the Long Beach (CA) Airport at approximately 2:07 p.m.

27. Later that same day, at approximately 8:05 p.m. and 8:06 p.m. PST, REESE, at (323) 812-2879, received calls from FNU LNU using (669) 322-6506. Beginning at approximately 8:37 p.m. PST, CARTER's phone was in the immediate vicinity of LAX

where it stayed. At approximately 8:43 p.m. PST, REESE's phone was also in the immediate vicinity of LAX until approximately 9:51 p.m. PST. At approximately 8:52 p.m., 9:01 p.m., and 9:13 p.m. PST, REESE, using (323) 812-2879, called FNU LNU at (669) 322-6506.

28. As with the April 11, 2024 exchange between REESE and CENDEJAS, case agents believe REESE was in telephone contact with FNU LNU at (669) 322-6506 to coordinate the exchange of a backpack containing narcotics with CARTER.

29. Case agents contacted an American Airlines employee who advised that CARTER had a reservation to depart on American Airlines flight 1564, LAX – Chicago, IL (ORD) – Pittsburg (PIT), with a delayed departure time of 1:12 a.m. (which would be on June 5, 2024), from Terminal 5, gate 53A.

30. Case agents also contacted Los Angeles World Airport (LAWA) Badging office, who advised that REESE had used his LAWA-issued badge to enter through Los Angeles World Airport ACAMS doors that lead to the Terminal 6 departure level. However, REESE was supposed to be on a day off from his work shift at LAX.

31. Case agents reviewed surveillance footage from within LAX and observed the following:

a. At approximately 9:03 p.m. PST, REESE was in the area of elevator T6-9, lower-level / tunnel area. REESE was observed to be in possession of a black colored backpack and sat near the area of Gate 67.

b. At approximately 9:10 p.m. PST, CARTER completed the Transportation Security Administration (TSA) screening process. CARTER was in

possession of a black colored "SwissGear" Scan Smart TSA laptop backpack.

c. At approximately 9:14 p.m. PST, case agents observed CARTER reach the area of elevator T6-9. REESE, while in possession of the dark colored backpack, appeared to see CARTER near the elevator, then walked through a door that leads to the lower-level / tunnel area. Approximately a few seconds later, CARTER walked into elevator T6-9, which also leads to the lower level / tunnel area.

d. At approximately 9:16 p.m. PST, REESE took the escalator from the lower-level tunnel area to the departure level. REESE was then observed walking northbound through the departure level and eventually exited the terminal and walked to the area of the LAX parking structure P5 / P6. Surveillance footage captured that REESE was in possession of a similar backpack (black colored "SwissGear" Scan Smart TSA Laptop backpack) as CARTER's. Based on the zipper configuration on the backpack it appeared to be the same backpack CARTER possessed before meeting with REESE in the lower level / tunnel area.

e. At approximately 9:16 p.m. PST, CARTER walked from the same area where REESE took the escalator, lower-level / tunnel area. Surveillance footage captured CARTER's black colored "SwissGear" Scan Smart TSA Laptop backpack, which appeared to be different than before meeting REESE. It appeared to case agents that the backpack was now weighed down and the zipper configuration was not the same.

32. Based on their familiarity with this investigation, case agents believed REESE and CARTER swapped backpacks.

33. At approximately 11:20 p.m. PST, case agents responded to Terminal 5,

Gate 53, to locate CARTER before her departure flight. Case agents located CARTER laying down on the ground behind the American Airlines ticket counter near Gate 53A. Case agents then observed what appeared to be the same black colored "SwissGear" backpack from surveillance footage, which was sitting on the ground, approximately 6 inches away from CARTER. No other passengers were in the immediate area of the backpack.

34. At approximately 11:48 p.m. PST, case agents exposed narcotic detection K-9 "Casey" to the general area where CARTER was laying down. Case agents advised that K-9 "Casey" had alerted to the black colored "SwissGear" backpack sitting next to CARTER. Case agents, who were in plainclothes, approached CARTER. Case agents tapped CARTER on her shoulder to wake her up. Case agents displayed to CARTER their DEA credentials and identified as law enforcement. Case agents explained to CARTER that a K-9 had alerted to the scent of narcotics coming from her black colored "SwissGear" backpack that was sitting next to her. Case agents asked CARTER if she was willing to accompany them to the LAXNTF office to discuss the contents inside her black colored "SwissGear" backpack. CARTER stood up, picked up her black colored handbag with multicolor lettering and the black colored "SwissGear" backpack and agreed to walk back to the LAXNTF office. While walking to the LAXNTF office, CARTER maintained possession of her handbag and backpack. CARTER asked case agents how long it would take because she needed to get back to her child and her sick mother. Case agents explained to CARTER that it was a 5-minute walk to the LAXNTF office.

35. While at the LAXNTF office, case agents explained to CARTER that a

narcotic K-9 had shown interest on her backpack. Case agents asked for consent to search the bags in her possession. CARTER verbally agreed and signed a DEA Consent Form giving case agents consent to search her bags.

36. Case agents searched the black colored handbag with multicolored lettering and discovered it contained miscellaneous women's clothing, toiletries and shoes. The Handbag also contained two Delta Airlines boarding passes dated June 4, 2024, for Delta flight 2426, ORD – SLT and Delta flight 855, SLT – Long Beach, both under the name of "CARTER/MICHELLE."

37. Case agents searched a pink colored coin purse which contained a Wisconsin Identification Card No. C636-5419-7808-09 and Visa Debit Card, both under the name of Michelle CARTER.

38. Case agents searched the black colored "SwissGear" backpack. Case agents opened the main compartment of the backpack and discovered 10 kilogram-sized vacuum-sealed packages. As an officer was taking out each vacuum-sealed package, CARTER spontaneously stated the following: "what the fuck is that, that is not my bag", "what is that, that's drugs, that's what the dog was smelling." CARTER claimed she had shopping bags and items from Ross, Walmart, and Target. CARTER also said, "What is that, that don't look like no weed."

39. Case agents advised CARTER that they would be conducting a test of the substance inside of the packages. Using the TruNarc Raman spectrometer handheld device, case agents conducted a presumptive test of the white powdery substance inside of one of the kilogram sized packages. The presumptive test of the white powdery

substance tested positive for Cocaine Hydrochloride. In total, the cocaine weighed approximately 11.76 kilograms (including the packaging).

**Identification of REESE's Vehicle**

40. On May 6, 2024, case agents met with ABM - Los Angeles International (LAX) Central Terminal Group, Field Operations Manager, who provided case agents with REESE's LAX parking records for the period of April 8, 2024 through May 6, 2024. Per the ABM LAX parking records, REESE parked a 2018 Porsche (Registered Owner: Stephen REESE at 182 3/4 Leimert Blvd, Los Angeles, CA) during this time frame. REESE also parked a 2002 Chevrolet (Registered Owner: Israel Galarza, at 9301 Shirley Ave, Apt 18, Northridge, CA) at LAX on two different occasions.

41. On June 7, 2024, case agents met with ABM-LAX parking, who provided REESE's parking records for the Porsche. Records and a printed digital photo of the Porsche indicated that REESE parked in the LAX parking structure P5 / P6 during the time frame that he met CARTER to swap the backpack containing the narcotics. The Porsche entered the P5 and P6 parking structure at approximately 8:49 p.m. PST, then exited the parking structure at approximately 9:29 p.m. PST. Moreover, case agents reviewed surveillance footage, which captured REESE walking from LAX Terminal 6 to the area of the LAX parking structure P5 /P6 minutes after meeting with CARTER inside of Terminal 6.

42. On June 18, 2024, the Honorable Michael R. Wilner, United States Magistrate Judge, Central District of California, authorized a search warrant for Stephen REESE's 2018, dark blue colored Porsche.

**REESE Arrest, Seizure of Devices, Identification of iCloud Accounts**

43. On June 20, 2024, at approximately 3:20 a.m. PST, case agents established surveillance at LAX parking structure 6, near section 2A, stall 34, where REESE's dark blue colored Porsche, bearing California License Plate 8YPK431, was parked. Court-authorized location data for REESE's cellular telephone, (323) 812-2879, revealed it was in the vicinity of LAX.[1] At approximately 5:25 a.m. PST, case agents observed REESE exit his vehicle. Case agents approached REESE and advised him that investigators wanted to speak with him. REESE was placed under arrest and escorted to the LAXNTF office. Case agents conducted a search of REESE incident to his arrest and discovered two mobile devices on his person: a blue iPhone in a clear dark case, Target Telephone 1, and a blue iPhone in a case with an Anime character, Target Telephone 2.

44. At approximately 6:20 a.m. PST, case agents executed the search warrant on REESE's dark blue colored Porsche, bearing California License Plate 8YPK431. Case agents discovered in the back seat of the vehicle two black colored "SwissGear" style backpacks. One backpack contained a light brown and white colored blanket, black and white colored woman's pants, a black & grey colored jacket, and a brown colored woman's top. The other backpack contained miscellaneous items along with a black colored table iPad, Target iPad. Both backpacks were very similar in appearance to the

[1] On June 17, 2024, the Honorable Stephen C. Dries, signed a warrant authorizing the collection of data pertaining to the location of multiple cellular telephones, to again include REESE's cell phone.

backpacks REESE and DTO members were believed to have exchanged.

45. Case agents advised REESE of his *Miranda* Rights, reading verbatim from the DEA Advice of Rights form. REESE advised that he understood his rights and, both verbally and in writing, indicated he wished to waive his rights. REESE acknowledged that the two cellular telephones found in his possession were his and advised that the passcode to each was the same, 226400. REESE also said the iPad found in his Porsche was his and that the passcode for the Target iPad was also 226400. Case agents verified that passcode 226400 opened all three devices. With REESE's consent, case agents also opened the two telephones and discovered Target Telephone 1 was assigned (323) 812-2879 (number used to communicate with DTO associates since at least June 2022) and Target Telephone 2 was assigned (213) 330-5580. Case agents then locked each device without searching them.

46. On June 27, 2024, the Honorable Nancy Joseph, United States Magistrate Judge, Eastern District of Wisconsin, signed a warrant authorizing the search of Target Telephones 1 and 2 and the Target iPad. On this same date, case agents executed the warrant on all 3 devices.

47. A physical search of Target Telephone 1 revealed that the contents of Target Telephone 1 appeared to have been deleted or that Target Telephone 1 had been factory reset on or about June 6, 2024. The photographs, text messages, e-mails, and call log in the phone are dated on or after June 6, 2024. As mentioned above, on June 5, 2024, CARTER was found by law enforcement to be in possession of a backpack she received from REESE that contained approximately 10 kilograms of cocaine, leading case agents

to conclude that REESE caused the contents of his cellular phone to be deleted so that a search of the phone itself would not contain any evidence of his and others' involvement in narcotics trafficking.

48. However, a review of the contact card for Target Telephone 1 revealed it was linked to iCloud account **coachreese65@icloud.com** ("**Target Account 1**"). In addition, the phone's settings revealed the phone's contents were set to automatically be backed up to the Cloud. The telephone applications that were using the Cloud include, but are not limited to, the following:

f. Messages in Cloud

g. Photos

h. iCloud Drive

i. iCloud Mail

j. Passwords and Keychain

k. Contacts

l. Reminders

m. Safari

n. Wallet

o. Maps

p. Facebook

q. Instagram

49. While reviewing Target Telephone 2, case agents observed REESE was in contact with phone number (323) 547-3915, believed to be used by CARNEGIE. While

reviewing the text conversations with CARNEGIE and REESE, case agents observed the following:

a. On March 31, 2022, at approximately 9:42 p.m., REESE received a text message from CARNEGIE, stating: "New Demo". Case agents believe that CARNEGIE was texting REESE from a new phone number and providing the new number to REESE.

b. On April 15, 2022, at approximately 8:02 p.m., the following text conversation between REESE and CARNEGIE occurred:

CARNEGIE: "Here"
REESE: "OMW"
REESE: "They in"
REESE: "?"
CARNEGIE: "They thru" and "There"
REESE: "OMW same people"
CARNEGIE: "Same everything"
REESE: "Bet"

CARNEGIE: "Said the team walked in"
CARNEGIE: "Here I'm the same spot he said"
CARNEGIE: "?"
REESE: "Now"
REESE: "Done"
CARNEGIE: heart shape emoji
CARNEGIE: "Thanks bro"
REESE: "Yup"

c. Based on their training, experience, and familiarity with the investigation, case agents believe that when CARNEGIE texted "Here" and "They thru," it meant that couriers working for CARNEGIE were at the airport and made it through

the security checkpoint at LAX. REESE replied, "OMW" which is shorthand for "on my way." Further REESE inquired if the couriers were the same people REESE met before ("same people"), and CARNEGIE confirmed they were ("Same everything"). Subsequently, CARNEGIE texted, "Here I'm the same spot he said…?" REESE replied, "Now…Done." CARNEGIE replied, "Thanks bro." Case agents believe CARNEGIE advised that the courier was present and inquired if s/he should meet with REESE at the same spot as before. REESE then advised that he met with the couriers and the transfer of illegal narcotics was successful.

50. While reviewing Target Telephone 2, case agents also located photographs of marijuana and THC-based products.

51. In this same text thread between REESE and CARNEGIE, case agents observed what appeared to be similar conversations occurring on numerous other occasions through at least January 7, 2023. Case agents believe this reflects an ongoing and sustained relationship between CARNEGIE and REESE to coordinate the transfer of illegal narcotics through LAX security for subsequent transportation and distribution.

52. Based on the aforementioned analysis of Target Telephone 1, case agents believe that it is likely that REESE also deleted drug-related conversations on Target Telephone 2 which may have been backed up to the iCloud account assigned to Target Telephone 2.

53. A further review of Target Telephone 2 further revealed the contact card for Target Telephone 2 revealed it was linked to iCloud account **bigreese3135@gmail.com** ("**Target Account 2**"). In addition, this phone's settings revealed the phone's contents

were set to automatically be backed up to the Cloud. The telephone applications that were using the Cloud include, but are not limited to, the following:

r. Photos

s. iCloud Drive

t. Passwords and Keychain

u. Notes

v. Contacts

w. Safari

x. Instagram

y. Messenger

z. Wallet

aa. Maps

bb. Dropbox

54. Based on the above, case agents believe that because REESE used his phones, which are linked to **Target Accounts 1** and **2**, to facilitate the trafficking of narcotics and to communicate with other DTO members regarding the same, there is reason to believe that information contained in these accounts, to include the messages, notes, contacts, photos, maps, and third-party communication platforms, was backed up to iCloud and that it will provide evidence of the DTO's operational methods, identities, and role of co-conspirators, and relevant locations.

55. On June 27, 2024, case agents sent a preservation letter to Apple, Inc. requesting preservation of all stored communications, records, location services records and other evidence relating to **Target Accounts 1** and **2** for Stephen REESE.

## BACKGROUND CONCERNING APPLE[2]

56. Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

57. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

58. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

59. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

---

[2] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Manage and use your Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "Introduction to iCloud," available at https://support.apple.com/kb/PH26502; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; and "Apple Platform Security," available at https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf.

60. iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

61. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

62. Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share their location with other iOS users. It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

63. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

64. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

65. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

66. Apple captures information associated with the creation and use of an¬ Apple ID. During the creation of an Apple ID, the user must provide basic personal

information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status ¬¬of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

67. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

68. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone

number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

69. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Some of this data is stored on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple. Records and data

associated with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

70. This is a complex narcotics trafficking investigation involving numerous targets and target locations. Through prior investigations, case agents are aware narcotics traffickers will communicate with customers and others involved through FaceTime and other user, end to end, encrypted communication methods. Additionally, case agents know narcotics traffickers will communicate with others involved in the conspiracy through text messages, and it is increasingly common for those communications to occur through iMessage and other messaging applications, such as WhatsApp, Instagram, SnapChat, etc. Case agents believe that the requested information will provide corroboration of the evidence described above, including but not limited to the information contained in extraction reports and will provide another method for authenticating that information.

71. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

72. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are

often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

73. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

74. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

75. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store

and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

76. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

77. Based on the forgoing, I request that the Court issue the proposed search warrant.

78. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with **coachreese65@icloud.com**, **Target Account 1,** and **bigreese3135@gmail.com**, **Target Account 2**, which are stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, California.

## ATTACHMENT B

**Particular Things to be Seized**

**I. Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b. All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses,

Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c. The contents of all instant messages associated with the account from January 1, 2020 to present, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

d. The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

e. All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call

invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

f. All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

g. All records pertaining to the types of service used;

h. All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

i. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. §841(a)(1) (distribution of controlled substances), 21 U.S.C. §846 (conspiracy to distribute controlled substances), and 21 U.S.C. §843(b) (use of a communicate facility in furtherance of drug trafficking); involving Stephen REESE since January 1, 2020, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a. Acquisition and distribution of controlled substances and collection and movement of drug proceeds;

b. Conspiracy to possess and distribute controlled substances;

c. Laundering of monetary assets;

d. Communications between Stephen REESE and others known and yet unknown related to narcotics trafficking and movement of drug proceeds;

e. Location of stash houses, rental agreements in connection with drug trafficking, payments for controlled substances, and other information related to the distribution of narcotics and controlled substances;

f. Information about the location or whereabouts of Stephen REESE;

g. The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

h. Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

i. Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

j. Evidence indicating the subscriber's state of mind as it relates to the crime under investigation; and

k. Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _________________________________, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Apple Inc., and my title is _____________________________. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Apple Inc. The attached records consist of _____________________ [(pages/CDs/megabytes)]. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Apple Inc., and they were made by Apple Inc. as a regular practice; and

b. such records were generated by Apple Inc.'s electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Apple Inc. in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Apple Inc., and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

| ______________________ | ______________________________________ |
| --- | --- |
| Date | Signature |